# Coleman's Appeal.    Grubbs' Appeal.

1. Coleman and Grubbs owned together large quantities of real estate, including the Cornwall ore-banks. They selected men to part and allot the real estate, agreeing that the Cornwall ore-banks should remain together and undivided as a tenancy in common, because of the impossibility of ascertaining the extent and limits of the ore, and because partition could not be made without great injustice to some of the parties. In amicable actions to carry out the partition, the court adjudged that the "ore banks, &c., do still remain undivided, to be held by (the parties) as tenants in common, according to their respective shares." *Held,* that the parties and their successors were tenants in common of the ore-banks.

2. Coleman *v.* Coleman, 7 Harris 100, remarked on and explained.

3. Whenever a judgment in a former case is relied on as conclusive in another, it may be shown by evidence *aliunde,* not inconsistent with the record, that the particular point was not adjudicated, if in law judgment could have been rendered on any other.

4. The plea of judgment recovered is mixed of matter of record with matter of fact.

5. Although it appear by extrinsic evidence that the matter was within the issue in the former suit, if it be not shown that the verdict and judgment necessarily involved its consideration, it will not be conclusive.

6. Under the plea of *non tenent insimul,* it may be shown that the parties had barred themselves by covenant from partition.

7. The plea *non tenent insimul* is the general issue, and means that the parties do not hold together so as to be entitled to partition.

8. The agreement that the Cornwall ore-banks should remain undivided established a permanent tenancy in common, and partition could not be had without violating the covenant, which ran with the land.

9. The agreement provided that neither of the parties should interfere or interrupt the others at any mine-holes by them opened and occupied for the purpose of raising ore: *held,* that this was not a mode of providing for the enjoyment in severalty of the shares of the parties.

10. This provision meant that the parties should be undisturbed in their rights as tenants in common to take and use their respective proportions of ore; and was a grant to open and occupy other mine-holes.

11. In every partition there must be a severance so that each tenant shall enjoy his purpart in severalty.

12. An incorporeal easement is extinguished by unity of title and possession.

13. A thing corporeal cannot be appended to a thing corporeal.

14. A right of way cannot be used by the owner of the dominant tenement to land other than that to which it is appertenant.

15. As to *fructus industriales,* a tenant in common does not receive more than his share, within the statute of Anne, if he merely has the sole enjoyment of the property, though by the employment of his own industry and capital he makes a profit by the enjoyment and takes the whole of it.

16. It is not waste in a tenant for life or years to work mines or quarries already opened.

17. The Act of April 25th 1850, § 24 (Mines held in Common), construed and applied in this case.

[Coleman's Appeal.]

18. A tenant of ore-mines had under his title no means of obtaining his own share other than by taking at the same time the shares of his fellows. *Held*, that the value of the ore in place, ore-leave, was the just basis of account in this case.

May 17th, 18th and 19th 1869.   Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeals from the decree of the Court of Common Pleas of *Lebanon county:* In Equity: No. 37, 38, 71, 72, 109, to May Term 1869.

The case commenced by a bill filed June 7th 1857 by Robert W. Coleman against William Coleman, Robert Coleman, G. Dawson Coleman, Edward B. Grubb and Clement B. Grubb for an account of ore taken by the parties from the Cornwall ore-banks in Lebanon county.

After the commencement of the proceedings both Robert W. Coleman and William Coleman died, and administration of their estates, respectively, was granted to A. Wilhelm and Jacob Weidle; Edward B. Grubb has also died, and administration of his estate has been granted to E. Burd Grubb.

By patents dated respectively November 30th 1737 and August 2d 1745, Peter Grubb became seised of two tracts of land in Lancaster (now Lebanon) county, containing together about 425 acres, on which were the Cornwall ore-banks and mine-hills. Peter Grubb died intestate seised of these tracts, leaving two sons, Curtis, the eldest, and Peter, on whom these lands descended, Curtis, under the intestate law of that day, taking two-thirds, and Peter (2d) one-third. On June 28th 1783 Curtis conveyed to his son Peter (3d), one-sixth of the Cornwall ore-banks, one-third of Hopewell Forges and one-sixth of all the land, &c., owned by Curtis in Lancaster county (except certain mills on the Swatara). On the 9th of May 1786 Peter (3d) conveyed to Robert Coleman all the interest in the Cornwall ore-banks, the Hopewell Forges and the other lands derived from his father, Curtis, reserving to himself, his heirs and assigns, the privilege of entering on the premises granted and digging and carrying away enough iron ore "for the supply of any one furnace at his election at all times thereafter." On the 8th of December 1785 amicable actions were entered in the Court of Common Pleas of Lancaster county, between Curtis Grubb, Robert Coleman and Peter Grubb (2d) for partition, amongst other things, of the Cornwall ore-banks. Before adjudication in these actions Peter Grubb (2d) died, having by his will, proved January 21st 1786, devised equally to his two sons, Burd and Henry Bates Grubb, all his real estate. By an agreement dated May 6th 1786 between Curtis Grubb, Robert Coleman, Jasper Yeates and others, executors, &c., of Peter Grubb (2d), and also guardians of Burd Grubb and Henry Bates Grubb, it was stipulated that the Cornwall ore-banks should be divided into three equal

[Coleman's Appeal.]

parts, two to be assigned to Curtis Grubb and Robert Coleman "according to their several shares therein," and one to Burd Grubb and Henry Bates Grubb, to be by them held in common ; and further that amicable actions on the case should be entered in the Common Pleas of Lancaster county, for the purpose of effectuating this agreement, and that amicable actions of partition should be entered in the same court and in the Common Pleas of Dauphin county to divide the furnaces, &c., and other real estate according to the meaning of the agreement, and agreeably to the report of men to be appointed for that purpose. By an agreement of August 30th 1787 between Curtis Grubb, Robert Coleman and Jasper Yeates and others, guardians of Burd Grubb and Henry Bates Grubb, reciting that "it hath been found, on the fullest investigation, that the agreement entered into between Curtis Grubb, Robert Coleman and the guardians of the minor children of Peter Grubb, deceased, cannot be carried into execution, without the greatest injustice to some of the said parties ; and the same having been so represented by the parties appointed in the said agreement to make partition ; therefore, in order to remove all difficulties in pursuance of this recommendation," the former agreement was changed as to the ore-banks, to the extent that they "should thereafter remain together and undivided as a tenancy in common," Curtis Grubb being entitled to three-sixths, Robert Coleman to one-sixth, and Burd and Henry Bates Grubb to two-sixths, and an accurate survey of the ore-banks was to be made ; and it was stipulated that neither of the parties "should interfere with or interrupt either of the others at any mine-hill by them opened and occupied for raising iron ore," and because "the articles respecting the ore-banks required further explanation, and it might so happen that veins of ore might extend beyond the limits of the survey then lately made by Thomas Clark, it was further agreed by a memorandum, supplemental to the agreement of the 30th of August 1787 bearing date the same day, and between the same parties, that the said Burd Grubb and Henry Bates Grubb and Robert Coleman, and their respective heirs and assigns, should have full liberty and privilege of ingress, egress and regress to and from the said mine-hills, and should have free and uninterrupted liberty and powers to dig, &c., and carry away any ore that may be found to extend beyond the limits of the said surveys, without doing any material damage to the iron-works or plantation ; and that the privileges of the waters should be secured in the most ample manner, for the use of the said Curtis Grubb and Robert Coleman, their heirs and assigns for ever." Amicable actions were accordingly entered, and referees appointed under them, whose reports, by which the lands were divided, were confirmed by the court ; the reports excepting from the lands awarded to Curtis Grubb and Robert Coleman, the Cornwall ore-banks "then

lately surveyed by Thomas Clarke," and declaring that the said ore-banks do still remain undivided to be held by Curtis Grubb, Robert Coleman, Burd Grubb and Henry Bates Grubb as tenants in common." The drafts of the survey exhibited by courses and distances three ore-banks which were known respectively as "The Large Iron-Hill," "The Middle Hill" and "The Grassy Hill." The partition was fully executed.

Curtis Grubb having died, his executors, pursuant to the directions of his will, on the 12th of January 1798 sold all his real estate to Robert Coleman, reciting in the deed the undivided character of the ore-banks. On the 4th of May 1798 Burd Grubb conveyed to Henry Bates Grubb all his interest in the estate of his father, Peter (2d), including the Cornwall ore-banks. On the 12th of May 1798 Henry Bates Grubb conveyed to Robert Coleman an undivided half of certain real estate including his interest in the Cornwall ore-banks. On the 13th of November 1802 Robert Coleman and Henry Bates Grubb entered into an agreement for partition of certain lands held by them, excluding the Cornwall ore-banks, and on the same day a writ of partition issued from the Common Pleas of Lancaster county. On the 18th of February 1803 Henry Bates Grubb executed to Robert Coleman a deed carrying out the partition made under the writ. Robert Coleman by his will proved September 3d 1825 devised, amongst other things, to his sons, William, James, Edward and Thomas Burd Coleman, "the aforesaid ore-banks and mine-hills as tenants in common, each of the said sons taking twenty equal ninety-sixth parts of the said ore-banks and mine-hills." On the 23d of April 1828 William conveyed his interest in the ore-banks to Thomas Burd Coleman; on the same day Edward Coleman conveyed his interest in the ore-banks to James and Thomas Burd Coleman. Robert W. Coleman, the plaintiff, and William Coleman, one of the defendants, were sons of Thomas Burd Coleman, now deceased, and held all his interest in the ore-banks. Robert Coleman and G. Dawson Coleman, defendants, are sons of James Coleman, now deceased, and hold all his interest in the ore-banks. Edward B. Grubb and Clement B. Grubb were sons of Henry Bates Grubb, now deceased, and held all his interest in the ore-banks. The interest of the parties in the ore-banks at the filing of the bill were as follows:—Robert W. Coleman, plaintiff, was entitled to $\frac{25}{96}$; William Coleman, defendant, to $\frac{25}{96}$; Robert Coleman and G. Dawson Coleman, defendants, by virtue of proceedings in partition in the estate of their father, James Coleman, were entitled to $\frac{30}{96}$ as tenants in common with each other, and Edward B. Grubb and Clement B. Grubb, under proceedings in partition in the estate of their father, Henry Bates Grubb, were entitled to $\frac{16}{96}$ as tenants in common with each other.

The bill set out the foregoing chain of title, and further alleged

[Coleman's Appeal.]

that on the 30th of March 1849 Robert W. and William Coleman entered into an agreement with Robert and G. Dawson Coleman, by which they agreed for five years to account to each other for all the ore taken by them respectively from the Cornwall ore-banks in accordance with their respective rights at the rate of fifty cents per ton; that both plaintiffs and defendants have taken ore from the banks, but that the defendants have taken ore in larger quantities than the plaintiff, and that the defendants have taken ore in excess of their interests in the ore-banks. There were interrogatories appended, corresponding with the averments in the bill.

The prayer was for an account.

William Coleman answered that he and the other parties, plaintiff and defendants, had taken ore from the banks, that he had used the banks since, but not before filing the bill, in partnership with the plaintiff for the purpose of taking ore away; but that he had not taken it in greater quantities than the plaintiff. That by the agreement of March 30th 1849, referred to in the bill, it was recited that the plaintiff, this defendant, Robert and G. D. Coleman and the Grubbs held the ore-banks as " a tenancy in common," in the proportions set out in the bill, and the parties to the agreement were desirous to account with each other for all the ore taken from the banks and used by them respectively, and agreed as was set out in the bill: this defendant admitted his liability to account under the agreement of 1849 according to its terms, except for ore mined up to January 1st 1857 for which he has already accounted, but whether he is liable to account under the "interests and titles" of the plaintiff and this defendant he is not informed, and submits himself to the judgment of the court. He answered the interrogatories categorically.

The Grubbs, by their answer, denied that they had taken more ore than the plaintiff or more than they were entitled to in proportion to their interests; they denied that they were liable to account, because, on or before the 28th of June 1783, there were erected on the lands, containing above 9000 acres, owned by Curtis and Peter Grubb, which included the ore-banks, a furnace called Cornwall Furnace, and the Hopewell Forges and Union Forge, which works were carried on by the said Curtis Grubb and Peter Grubb (2d), and that they obtained their ore from the Cornwall ore-banks; they set out the conveyance and proceedings referred to in the statement of the case. They further averred that on the 8th of December 1785, Curtis and Peter Grubb (2d) and Robert Coleman used the ore from the banks for manufacturing iron; that Robert Coleman then owned other lands on which he had a furnace called "Elizabeth Furnace," at which he used the ore from the Cornwall ore-banks. That Peter Grubb (2d) owned Mount Hope Furnace, situate on other lands, and supplied it with ore from the Cornwall ore-banks. That the three Cornwall mine-

hills form a continuous deposit of ore, and contain about 108 acres, the surface being waste, but underlaid with large and unknown quantities of ore, their value consisting solely in the ore; that on the 8th of December 1785, the Grubbs and Robert Coleman entered into the agreement, appointing Thomas Clarke and six others, or any four of them, to value and partition the lands held by them in common, as set out in the statement of the case. Before partition was made under the agreement, Peter Grubb (2d) died, devising his land to his sons Burd and Henry Bates as before stated; that afterwards Coleman,. Curtis Grubb, and Burd and Henry Bates Grubb, by their guardians Jasper Yeates and others, made the agreements of the 6th of May 1786 and 30th of August 1787 mentioned above. These defendants further averred that the parties to the partition took possession of their respective parts, that Curtis Grubb and Robert Coleman obtained ore from the Cornwall ore-banks for Cornwall Furnace, and Burd and Henry Bates Grubb for the Mount Hope Furnace, as it had been theretofore got and used. That the reservation in the deed of May 9th 1786, from P. Grubb (3d) to Robert Coleman, of ore sufficient to supply one furnace, is vested in Henry P. Robeson and Clement Brooke, that each of the parties severally opened and occupied mine-holes, which were held by said parties respectively, and by those who succeeded to their rights without interference or interruption by the others according to the agreement of August 30th 1787. That Robert Coleman, in 1791, was owner of Colebrooke Furnace on other lands adjoining the Cornwall Furnace tract which he and those succeeding him have occupied for the manufacture of iron, and which is now so occupied and used by William Coleman, the defendant, and for which the ore has been obtained from the Cornwall ore-banks; the ore for this furnace and Elizabeth Furnace was supplied while the said Robert was owner of one-sixth of the Cornwall ore-bank under the reservation to Peter Grubb (3d); that Burd and Henry Bates Grubb got from said banks ore for Mount Hope Furnace; that Henry Bates Grubb got ore from said banks for Mount Vernon Furnace, 17 miles from Cornwall Furnace, and these defendants got ore from said banks for Manada Furnace, 19 miles distant and also for Mount Vernon Furnace since they have owned it. All the aforesaid furnaces are charcoal furnaces. They further averred that Robert and G. Dawson Coleman, in 1844, built Lebanon Furnace about 6 miles from the ore-banks; in this furnace anthracite coal is used, and the plaintiff in 1851, on lands adjoining the ore-banks, built Cornwall Anthracite Furnace, in which anthracite coal is used. The ore for these furnaces was obtained from their respective mine-holes on said ore-banks without interference. They specified other furnaces belonging to one or other of the parties for which

12 P. F. Smith—17

ore was taken in the same manner. They further averred that it was understood by the parties at the time of the agreement for partition that the Cornwall ore-banks contained a great quantity of iron-ore which could not be ascertained, that the parties to the partition and those who have held or now hold an interest as tenants in common in the ore-banks, have carried away large quantities of ore for the manufacture of iron by them without keeping any account, the "parties having always treated the same as so agreed to be used and not accounted for." These defendants submitted to the court that the partition of 1787 was a partition in effect of the ore-banks so far as concerned the ore, providing for each party opening mine-holes, and that as such mine-holes have been so opened and occupied, these defendants are not accountable to the other parties. They further averred that until recently the parties took the ore for the purpose of being made into iron, for which defendants denied accountability, but that recently the parties have mined and sold ore to other persons. The defendants submitted to the court whether there is a right so to sell ore, and whether there is any accountability therefor. They answered the interrogatories.

Robert and G. Dawson Coleman by their answers protested against and denied the right of the plaintiff as co-tenant with them to demand any account of ore mined from the Cornwall ore-banks, but averred that for the mutual interests of the plaintiff and themselves they entered into the agreement of the 30th of March 1849, referred to in the bill; they averred that they have accounted for all the ore taken under the agreement from April 1st 1848 until January 1st 1851; that it was understood at the making of the agreement that all claim for ore taken prior to it, if any there was, which they denied, was abandoned; that the ore in the banks is so great as scarcely to be capable of estimation; that it is believed there are more than 40,000,000 tons lying above the water level, and probably a greater amount below; and that the ore-banks extend a long distance under the surface of the adjacent land known as the Cornwall Estate; that these defendants and their predecessors under claim of title have mined and used the ore openly, with the knowledge of the plaintiff, and without objection until in the year 1847, when he set up the claim to confine them to a line on the surface of the land, and that the plaintiff and defendants are seised as tenants in common of all the ore in proportions not less than they are seised of the mines within the lines set forth in the bill, and that from 1787 to 1847 each owner was permitted to mine to any extent without any request to account, because for all practical purposes the ore was inexhaustible, and the owners knew that more was left than would equalize them with their co-tenant; they insisted that except under the agreement of 1849, they are under no pecuniary liability to any of the

parties for ore; they averred that under the agreements and judicial proceedings hereinbefore set out, the manner of working the ore-banks has been for the several parties to select certain spots on the surface of the mine-hills for mining and carrying away the ore ; these spots called mine-holes, were excavations into the side of the hills of but little depth, were not subterraneous but superficial diggings, and were so worked as to obtain at the smallest expense and with the greatest ease the largest quantity of ore; they were as large or larger at the surface than at any interior point, and have always been worked .by sunlight; the parties have always respected the selections thus made, and permitted the persons so selecting to continue their enjoyment without hindrance ; and " so great is the superabundance of the supply of ore in the hills, and such is the facility of mining the same, and so extensive is the surface of the unmixed masses or hills of iron ore, that it has always been entirely immaterial to any one what particular place or spot any particular person might select as a mine-hole, saving only the convenience afforded by the presence of tools and implements for working the same, and for a short time past, the construction of railways from a line of road into the sides of the hills by the parties who were there working the ore-banks for the greater facility of loading cars to carry away the ore.   Saving these arrangements and conveniences, there is no choice and never was a choice between the spots selected for working, there being no shafts, pits or the like contrivances for reaching the ore, nor the smallest previous digging or preparation required to enable the parties, their agents and servants, to dig and carry away any quantity of ore, whenever they saw fit to exercise the right."

These defendants insisted that the agreements of 1786 and 1787 and the proceedings under it, do no more than protect the owners in the enjoyment of their respective mine-holes, whilst they are bonâ fide used for taking out ore, and they asked a decree of the court to regulate the mode of working the premises ; they averred that the ore being for practical purposes pure and unmixed, " the uniform mode of working these hills for a century past has been by superficial diggings. in the manner usual in levelling hills or digging gravel from hills or mounds thereof above the surface of the land, when the intent was to remove the whole of the hill, and level the site thereof.   There have never been any subterraneous workings for iron-ore, nor any of the expensive contrivances usual in mining; the work has always been prosecuted by daylight, and there have been no cuttings or excavations of greater depth than thirty feet, excepting the cuttings in the breast of the hills from the base or near the base, which have been thus worked into and upon the face of the hill to a greater depth, but never lower than the level of the road, by which the ore when dug is carried away.   The motive for making these deeper cuttings

[Coleman's Appeal.]

rather than continuing the surface diggings has been the greater convenience of loading in railway-cars which are brought to the side of the hill.   In no case has there been any work done in getting iron-ore in the manner of ordinary mining, but always by such superficial and surface diggings as have been described.  And the workings are in another particular varied from that usual in mining, viz. : that the whole body of the hill which is dug into, as well that which lies below the surface as the surface itself, is carried away and used as iron-ore for smelting."

They averred that mining in the ordinary way by subterraneous digging, &c., would for a longer time than the present generation be unprofitable, and without any possible benefit; that they have not taken their share of the ore, nor as much as the other parties might in the same manner take, &c.

The court (Pearson, P. J.), after argument on bill and answers, decreed, January 6th 1859 :—

"That a full and true account be taken, between the parties above stated, of all ores taken or sold by them, or any of them, from the Cornwall ore-banks and mine-hills, of which they are tenants in common in the proportions stated in the bill; and it is further ordered that it be referred to John W. Ulrich, Esq., a master in chancery, to take and state an account between the said William Coleman, Robert Coleman, G. Dawson Coleman, Edward B. Grubb, Clement B. Grubb, and Robert W. Coleman, touching the several matters of account in said bill and answers mentioned. That in taking said account the said master commence with the 1st day of April 1848, and charge each of said parties with all ore taken, used or sold from their common property described in said bill and several answers; and for the purpose of stating said account the said Robert W. Coleman and William Coleman be taken as one party, owning together fifty ninety-sixth parts, and no account to be stated between them; that Robert Coleman and George Dawson Coleman be taken as one party, owning together thirty ninety-sixth parts, and that no account be taken between them; and that Edward B. Grubb and Clement B. Grubb be taken as one party, owning sixteen ninety-sixth parts, and that no account be taken between them; but that each of said parties, divided as aforesaid, account to the other according to their respective portions in the common property as aforesaid.  That in taking said account between the said Robert W. Coleman and William Coleman on the one part, and Robert Coleman and George Dawson Coleman on the other part, between the 1st day of April 1848 and the 1st day of April 1853, the master be governed and guided by the terms and conditions of the article of agreement entered into between the parties on the 13th day of March 1849, and so far as the account has been stated and settled between the parties under that article he is not to travel into the

same; and from and after the expiration of the article, each of the parties is to be charged with the ore taken, used or sold by them respectively, according to its actual market value at the time of taking, using or selling the same. That in taking the account between the said Edward B. and Clement B. Grubb, and the said Robert W., William, Robert and George Dawson Coleman, the respective parties be all charged with the quantity of ores taken, used and sold by them respectively, according to its actual market value at the time of so taking, using, selling or otherwise disposing of the same; and in stating that portion of the account, the said Colemans are to be charged with all iron ore taken or used by Robinson & Brooke, or either of them, under the reservation contained in the deed from Peter Grubb and wife to Robert Coleman the elder, 'of sufficient ore for the supply of one furnace,' said ore to be charged to them in the proportion of their respective interest in the ore-banks, and at the actual market value at the time of taking the same. And for the better discovery of all the matters aforesaid, the said parties are to produce before the said master, upon oath, all books, papers," &c.　*　*

The master, Mr. Ulrich, reported November 1st 1861; and on a number of exceptions filed by all the parties, the court, February 10th 1862, made the following order:—

" The report is referred back to the master on the three points named, to wit: The value of the ore from 1848 to 1853, as between the Messrs. Colemans and Grubbs; the difference in the relative quality and value of the ore mined, sold and used by Messrs. R. W. and W. Coleman, and George D. and R. Coleman, from the 1st of April 1853 to the 1st of January 1859, and the difference in the expense of mining between the same periods. And in regard to each of these points the parties are at liberty to introduce new or additional evidence if they see proper. We would further add, that if any of the parties consider themselves seriously aggrieved by the alleged error in the original decree, requiring the accounts to be taken jointly between the respective brothers, instead of separately against each, they must present their application for an amendment of the decree in proper legal form, prior to going before the master under the present order.

" The other exceptions are disregarded or overruled."

April 22d 1862, G. Dawson Coleman petitioned the court for a modification of the decree of January 6th 1859.

On the 3d of June 1862 the court modified the decree as follows:—

" All ores taken, used or sold by Robert Coleman and George Dawson Coleman, jointly or on their joint account, from the Cornwall ore-banks and mine-hills, between the 1st day of April 1853 and the time fixed by the master for closing the account, shall be charged against them jointly, computing the shares of the two at

thirty ninety-sixth parts of the whole; and where ore was taken, used or sold by them severally, the same shall be charged to them severally, computing each to be the owner of fifteen ninety-sixth parts of the premises. And all ore taken, used or sold by Edward B. Grubb and Clement B. Grubb, jointly or on their joint accounts, from the said Cornwall ore-banks and mine-hills, as described in the plaintiff's bill, between the 1st day of April 1848 and the time fixed by the master for closing the account, shall be charged to them jointly, computing the shares of the two at sixteen ninety-sixth parts of said ore-banks; and where ore was taken, used or sold by them severally, the same shall be charged to them severally, computing the shares of each at eight ninety-sixth parts of said ore-banks. And in all cases where it cannot be ascertained from the accounts kept, or other evidence, whether the said ores taken, used or sold by the said Robert Coleman and George Dawson Coleman, were taken by them jointly or severally, the same shall be treated and charged by the master as done jointly, and the same rule shall be adopted in taking the account against the said Edward B. and Clement B. Grubb."

Mr. Ulrich having died, John H. Briggs, Esq., was on the 4th of September 1865 appointed master. The master declined to state any separate accounts between the parties. He reported that the ore taken by the parties respectively, should be charged to them at its value on the bank after it was mined, less the cost of mining.

He charged interest from the 1st of January, 1859, the time which he fixed for closing the account, until January 1st 1868, when the account was prepared for presenting to the court, and reported as the result:—

" That R. & G. D. Coleman have received (including the interest as therein calculated) an excess above their proportionate share in the total value,    $185,882.80

" Which they owe to the other tenants in common, as follows, viz. :—

| | |
|---|---|
| To the estates of R. W. & W. Coleman, | $146,957.59 |
| To the estate of E. B. Grubb and to Clement B. Grubb, | 38,925.21 |
| " Total, | $185,882.80 |

Also, that the estate of E. B. Grubb & Clement B. Grubb, owe to the estates of R. W. & Wm. Coleman, as per the accounts,    $24,766.69"

Robert and G. D. Coleman filed exceptions as follows :—

1. Because the master has stated the account as between the defendants jointly, and the administrators of the estate of R. W. and W. Coleman jointly, and between these defendants jointly, and Edward B. and Clement B. Grubb jointly.

[Coleman's Appeal.]

2. The master .erred in his construction of the order of the court, in reference to the allowance for the difference of value between the ore taken by R. W. and W. Coleman, and that taken by Robert and G. Dawson Coleman, and in his action and mode of stating the account.

3. The master has erred in his construction of the evidence, as to the relative value of the ore used or sold by the respective parties.

4. The master was misled by his inspection of the ore-banks, and erred in the inferences drawn, because that inspection was in 1865, while the ore, in respect of which the account was taken, was mined between the years 1847–59, and the only question was the value of such ores as were then taken.

5. The master has erred in disregarding the only material fact, viz.: what was the actual value of the ore taken by each party at the time it was taken.

6. In disregarding the direct and positive proof on all sides, that these defendants had worked .deeper than the other, and that the deeper ore was more sulphurous and less valuable than nearer the surface.

7. The master erred in the inference, from the evidence as to the similarity of the iron produced at Cornwall and Lebanon.

8. The report of the master is uncertain as to the grounds on which he refuses to allow a greater difference in the value of the ore taken by defendants and R. W. and W. Coleman and the Messrs. Grubb.

9. The master erred in allowing to the other parties the same amount for the expense of mining, that he allowed these defendants—which was their actual outlay—while he admits the other parties paid less, for the reason that their mining was easier and less expensive.

10. The master has erred in allowing the other parties an actual profit, being the difference between the expense of mining paid by them, and the amount allowed them for such expenses, which, it is admitted by the master, they did not pay.

11. The master has erred in not allowing anything but actual expenses to these defendants, for the result of the work for which they are to account to their co-defendants—being co-tenants of property held in common—thus giving the other parties all the advantage of the time, labor, hazard of these defendants in mining and selling and collecting the proceeds.

The administrators &c., of R. W. and William Coleman filed exceptions as follows :—

1. The master erred in not allowing interest on the balances that were due at the close of each year.

2. The master erred in the valuation he placed upon the ores taken by the parties respectively : it is too low.

3. The master erred in his account between R. W. and W. Coleman, and E. B. and C. B. Grubb, in the item of the difference between stock-house weight and Collier's weight, by charging the average value at seventy-one cents per ton for the *whole period* from April 1st 1848 to January 1st, 1859.

The Grubbs filed exceptions, as follows :—

1. For that the court having referred the accounts back to the master for the purpose of correcting an error committed in the first report, viz., the reduction of the price of ore from 1848 to 1853, the present master, upon evidence substantially the same as then before the court, makes a still further reduction.

2. For that the question of the reduction of price for the period aforesaid was not referred to the master.

3. For that it appears by the said report that the basis of such reduction of price was :—1st, an agreement between the Colemans themselves which the court had decided to be of no effect as against the Grubbs ; and 2d, the opinion of a witness, C. B. Forney, who was not an expert on the subject of prices of ore, and therefore incompetent to give an opinion.

4. For that the witness alluded to based his opinion as to the value of ores for said period upon the agreement aforesaid, and upon a comparison with the alleged values of ore-leaves at other mines ; though he was ignorant of the cost of mining and raising ore at such other mines, and was therefore without the necessary elements or data for making such comparison.

5–7. For that the master makes said agreement conclusive as to price, upon persons not parties thereto, for the whole period of said contract, and disregards the evidence of value, as shown, 1st, by actual sales to third persons ; 2d, by comparison with other ore-leases at the same period.

8–10. Relate to errors in fixing the value of the ore.

The Court of Common Pleas on the 6th of July 1868 made the following decree : " That all the exceptions to the report of the master be overruled, that the said report be approved and confirmed, and that the several parties against whom, by the said report, balances and sums of money have been found due and owing, be ordered, adjudged and decreed to pay the same to the several and respective parties in whose favor respectively such balances and sums of money have been due and owing as aforesaid, viz. : That the said Robert and George Dawson Coleman be ordered, adjudged and decreed to pay to Jacob Weidle and Artemus Wilhelm, administrators *de bonis non* of Robert W. Coleman, deceased, and of William Coleman, deceased, the sum of $146,957.59 with interest from the first day of January last, being for the account of ore taken from the common property described in said bill of complaint, from the 1st day of April 1853 to December 31st 1858.

" And that the said E. Burd Grubb, administrator of Edward

B. Grubb, deceased, and Clement B. Grubb, be ordered, adjudged and decreed to pay to the said Jacob Weidle and Artemus Wilhelm, administrators *de bonis non* of said Robert W. Coleman, deceased, and of William Coleman, deceased, the sum of $24,766.69, with interest from the 1st day of January last, being for account of ore taken from the common property described in said bill of complaint, from the 1st day of April 1848 to December 1858.

"And also that the said Robert and George Dawson Coleman be ordered, adjudged and decreed to pay to E. Burd Grubb, administrator of Edward B. Grubb, deceased, and Clement B. Grubb, the sum of $38,925.21, with interest from the first day of January last, being for account of ore taken from the common property described in said bill of complaint, from the first day of April 1848 to December 31st 1858.

"And it is further ordered and directed, that the payment by the said Robert Coleman and George Dawson Coleman, or either of them, of the several sums ordered, adjudged and decreed to be paid by them as aforesaid, shall in no wise affect, preclude or determine the rights and proportions of interest of said Robert Coleman and George Dawson Coleman, as between themselves, but that their respective rights, interests and liabilities as between themselves as aforesaid, shall be and remain according to their several and respective interests in or on account of the common property, and according to any contract relations existing between them.

"And the release and discharge of the said administrators of the estate of Robert W. Coleman, deceased, and also of William Coleman, deceased, respectively, shall for ever exonerate the said Robert Coleman and the said George Dawson Coleman, and also the estate of Edward B. Grubb, deceased, and the said Clement B. Grubb, from all future demand and liability on account of any money ordered to be paid by them or either of them under this decree. The amount so paid to the said administrators to be adjusted between the said estates of Robert W. Coleman, deceased, and William Coleman, deceased, according to the interest of the respective decedents therein.

"And the release and discharge of the administrator of Edward B. Grubb, deceased, as also of Clement B. Grubb, respectively, shall for ever exonerate the said Robert Coleman and the said George Dawson Coleman from all future demands and liability on account of any money ordered to be paid by them under this decree. The amount so paid to the said administrator, and to the said Clement B. Grubb, to be adjusted between them according to the interest of the respective parties therein; and that the costs be paid by the several parties in proportion to their interests in the mine-hills."

All the parties appealed.

The Colemans assigned for error, that the court erred:

1. In directing an account to be taken as between the defendants, there being nothing on the record by way of cross-bill, or otherwise, demanding such an account, nor giving any opportunity to set up or prove any defence; and as to two of the defendants, in whose favor such a decree was made, all liability of the parties to account was denied by themselves.

2. In directing an account as between R. and G. D. Coleman, or either of them, and E. C. Grubb and C. B. Grubb, they not claiming the same, but denying any liability.

3. In decreeing an account by the same parties to R. W. and William Coleman, jointly, the latter not having asked for such account on the record.

4. In decreeing payment upon said accounts being thus stated, to such parties.

5. In decreeing an account and payment jointly to the several administrators of R. W. and W. Coleman, who are two tenants in common, in right of those estates and titles to be made by R. and G. D. Coleman, who are not proceeded against otherwise than as tenants in common, nor is in any other ground of a joint liability averred, nor any pretence of a joint liability to the parties to whom the amount is decreed, averred; such parties also claiming as representatives of two tenants in common not having any joint interest.

6. In so decreeing as respects the liability of R. and G. D. Coleman to the administrators of Edward B. Grubb and Clement B. Grubb, who were tenants in common only, and had no joint interest or right to demand an account.

7. In decreeing that under the title set up by the bill, and the title and circumstances averred by the answer, there was a liability on the part of Robert or George D. Coleman, or either of, them, to account to all other the tenants in common.

8. In the decree as respects the basis on which the account was ordered, taken, settled, and decreed to be paid.

9. In the report of the master, and the decree confirming the same as to matters of fact connected with the charges and the allowances.

The Grubbs assigned for error:

1–3. Overruling their exceptions.

4. The court erred in entering a decree against E. and C. B. Grubb, in favor of one set of the heirs of Robert Coleman, although it appeared that as against all of the heirs of the said Robert Coleman they had taken less than their share of the ores mined.

5. The court erred in imposing a proportion of the costs upon E. and C. B. Grubb, in whose favor a balance is found by the master as against the heirs of the said Robert Coleman.

[Coleman's Appeal.]

The administrators, &c., of R. W. & W. Coleman assigned for error:

1. The court erred in overruling the first exception to the master's report, which was: "The master erred in not allowing interest on the balances that were due at the close of each year."

2. The court erred in overruling the second exception to the master's report, which was: "The master erred in the valuation he placed upon the ore taken by the parties respectively—it is too low."

3. The court erred in overruling the third exception to the master's report, which was: "The master erred in his account between R. W. & W. Coleman and E. B. & C. B. Grubb in the item of the difference between stock-house weight and colliers' weight, by charging the average value per ton for the *whole period* from April 1st 1848 to January 1st 1859."

*R. C. McMurtrie* and *Black*, for R. & G. D. Coleman.—Can there be a decree for an account to a co-defendant without a prayer by him? 2 Dan. Ch. Pract. 1647; Mitford's Pl. 81–3; Talbot *v.* McGee, 4 Munro 379; Pattison *v.* Hull, 9 Cowen 747; Miller *v.* Fenton, 11 Paige 18; Troup *v.* Haight, 1 Hopkin's Ch. 270; Carnochan *v.* Christie, 11 Wheat. 446. There was not a joint demand: McPherson *v.* McPherson, 11 Iredell 391; Hall *v.* Fisher, 20 Barbour 441; McCreary *v.* Ross, 7 Watts 483.

The proceedings in 1785–7, with the agreement and judgment thereon, while that remained in force, and until varied by consent or decree, did operate as a partition, and the partition or mode of enjoyment and use thus enforced precluded all right to inquire what use was made of the ore taken by either party and all right to an account for its value.

An award determining future several enjoyment is a partition, and one who has pleaded such an award in bar to a subsequent writ by his co-tenant, and obtained judgment on that ground, cannot deny it; the plea *non tenent insimul* was made by the plaintiff here, in Coleman *v.* Coleman, 7 Harris 100, and the judgment was reversed on showing the former award in partition. An agreement not to partition will not bind: Jameson *v.* McCredy, 5 W. & S. 139. There may be a good partition as to profits, though there be no severance of the inheritance: Viner's Abr. *Partition*, B 3; Bodicoate *v.* Steen, Dickens 69; Co. Litt. 164 b, 167 a, 181 a; Bishop *v.* Salisbury, 1 Salk. 43; Smith *v.* Smith, 1 Hoffm. Ch. R. 21; Kidder *v.* Risford, 16 Verm. 169; Peck *v.* Cardwell, 3 Beav. 137; Collyer on Partp. 661, note a; Ulpian Dig. Lib. 23. A grant of a right to mine gives a right in common with the owner of the soil: Lord Mountjoy's Case, 4 Leon. 147; Chetham *v.* Williamson, 4 East 476. At common law a tenant in common was not

[Coleman's Appeal.]

liable for profits out of the land if there was no waste: Free *v.* Stotenbeer, 36 Barbour 641. An ore-owner cannot consume part of the corpus without accountability, except where destruction is the only mode of using, if there be less taken than the share of the whole: Lyles *v.* Lyles, 1 Hill Ch. 76; Nelson *v.* Clay, 7 J. J. Marsh 138; Roberts *v.* Roberts, 2 Jones Eq. 128, 133; Ballou *v.* Wood, 8 Cush. 54; Valentine *v.* Johnson, 1 Hill Ch. 47; Forbes *v.* Shattuck, 22 Barbour 568; Izard *v.* Bodine, 3 Stockt. 403; Norway *v.* Rowe, 19 Vesey 159; Parrott *v.* Palmer, 3 Mylne & Keene 632. Occupation either by residence or profitable form of cultivation, creates no liability on a co-tenant: Adams Eq. 232; Lorimer *v.* Lorimer, 5 Mad. 363; McMahon *v.* Burchell, 2 Phillips 127; Henderson *v.* Eason, 2 Phil. 308, s. c. 17 Queen's Bench 701; Sargent *v.* Parsons, 12 Mass. 149; Wilbur *v.* Wilbur, 13 Metc. 404; Chambers *v.* Chambers, 3 Hawks 232.; Shields *v.* Slack, 4 Ga. 429; Roberts *v.* Roberts, 2 Jones Eq. 128; Woolever *v.* Knapp, 18 Barb. 265; Adams *v.* Palmer, 6 Gray 336; Peck *v.* Carpenter, 7 Id. 283; Badger *v.* Holmes, 6 Id. 118; Dodd *v.* Watson, 4 Jones Eq. 48; Pico *v.* Columbia, 12 Cal. 414; Dresser *v.* Dresser, 40 Barb. 300. As soon as ejectment would lie, accountability begins: Hare *v.* Fury, 3 Yeates 13. The measure of mesne profits is the rent received: Cooper *v.* Cooper, 1 Stockton 566; Henderson *v.* Eason, 17 Ad. & Ellis N. S. 709. Where there is a liability to account under a legitimate use of the common property, the measure is the value that the co-tenant could have sold his interest in the property before severance for, or where the usual mode of disposing is by letting, could have leased that interest: Allen *v.* Barkley, Spear's Ch. 265; Bennett *v.* Thompson, 13 Iredell 143; Thompson *v.* Berlick, 1 McMullen Ch. 75; Shula *v.* Stark, 14 Geo. 429; Roberts *v.* Roberts, *supra;* Turner *v.* Morgan, 8 Vesey 145; Forbes *v.* Shattuck, *supra;* Tripley *v.* Riley, 15 Barb. 334; Maysville *v.* Shultz, 3 Dana 10; Morgan *v.* Powell, 3 Ad. & Ellis N. S. 284; Rex *v.* Adams, 4 Barn. & Ad. 61; Rex *v.* Tomlinson, 9 B. & C. 163; Rex *v.* Mitton, Id. 810; Rex *v.* The Hull Dock Co., 3 Id. 516; Reg. *v.* Southampton Dock Co., 14 Ad. & Ellis N. S. 587; Rex *v.* Attwood, 6 B. & C. 277; Rex *v.* Bridgewater, 9 Id. 67; Rex *v.* Oxford Canal Co., 10 Id. 163; Rex *v.* Cambridge, 8 Ad. & Ellis 73; Reg. *v.* Westbrook, 10 Ad. & Ellis N. S. 178; S. E. Railway *v.* Dorking, 3 Ellis & Black. 499; Reg. *v.* Ferry Co., 8 Id. 149; Reg. *v.* Longwood, 17 Ad. & Ellis N. S. 871.

*C. B. Penrose* and *E. S. Miller*, for Grubbs.—As to interest they cited Hodges *v.* Parker, 17 Vermont 242; Jeremy's Eq. 543; Collyer on Partp., § 335; Huff *v.* McDonald, 22 Geo. 131; Graham *v.* Williams, 16 S. & R. 257; Delaware Ins. Co. *v.* Delaune, 3 Binney 295; Crawford *v.* Willing, 4 Dallas 289;

[Coleman's Appeal.]

Koons v. Miller, 3 W. & S. 271; Watt v. Hoch, 1 Casey 411; Young v. Herdic, 5 P. F. Smith 176; the Act of April 25th 1850, § 24, Pamph L. 573, Purd. 29; pl. 7. The co-tenants were liable in equity as soon as they took the ore. In account a decree may be made in favor of a party although he has not asked it: 1 Story's Eq. § 522. Partition is not inseparable from tenancies in common, and may be waived by agreement: Conant v. Smith, 1 Aiken 67; Litt. § 318, Co. Litt. 187 a; Brown v. Lutheran Ch., 11 Harris 500; Coleman v. Coleman, 7 Harris 100. Tenants in common cannot pass an estate by release without words of inheritance: Gilbert on Tenures 74, *Release;* Litt. § 465; Co. Litt. 273 b; Filbert v. Hoff, 6 Wright 97. The tenants taking are liable to their co-tenants as bailiffs: 4 Kent's Comm. 369; Co. Litt. 172 a; McAdam v. Orr, 4 W. & S. 550; Shula v. Stark, 14 Geo. 429; Izard v. Bodine, 3 Stock. 403; 2. Fonbl. Eq. B. 2, ch. 7 § 6, note; 1 Eq. Abrid. 5, note *a.* Very minute expenditure has occurred, and therefore little or no risk of loss; if large sums had been expended in sinking shafts, &c., it might be inequitable to ask an account: Prendergast v. Turton, 1 Y. & C. C. 98; s. c. 13 L. J. Ch. 238; Clegg v. Edmundson, 3 Jur. N. S. 299; Senhouse v. Chistian, 19 Beav. 356; Borrell v. Borrell, 9 Casey 492; Walker v. Humbert, 5 P. F. Smith 407. The mode of computing interest is equivalent to allowing compensation for services to which a co-tenant is not entitled: Collyer on Part. § 165; Fereday v. Wightwick, 1 Taml. 250; Jeffreys v. Smith, 1 Jac. & W. 298; Huff v. McDonald, *supra;* Crest v. Jack, 3 Watts 238. There is a trust between tenants in common: Gibson v. Winslow, 10 Wright 380; Weaver v. Wible, 1 Casey 271; Irwin v. Brown, 11 Id. 331; Brigham v. Eveleth, 9 Mass. 538; Jones v. Harraden, Id. 540; Lyon v. Gormley, 3 P. F. Smith 261.

*F. W. Hughes, G. W. Biddle* and *Strong* (with whom were *A. R. Boughter* and *J. Reynolds*), for the administrators of R. W. and W. Coleman.—There should have been no allowance for ore taken outside the limits of the Clarke survey: Blewett v. Coleman, 4 Wright 45. As to charges of interest, partnership and tenancy in common are not analogous: Docker v. Somers, 2 Mylne & Keene 655; Gow on Part. 355; Story on Part., § 343; Goddard v. Bellow, 1 Nott & McCord, 46 Collyer on Part. § 335. Trustee refusing to account is chargeable with compound interest: Jeremy's Eq. 544; 2 Story Eq. Jur. § 1277; Mumford v. McKay, 8 Wend. 442; Irvine v. Hanlin, 10 S. & R. 219; Act of April 25th 1850, *supra;* Weaver v. Wible, 1 Casey 271; Irwin v. Brown, 11 Id. 331; Jamison v. Hopgood, 10 Pickering 772; Kent's Com. 231; Eckert v. Wilson, 12 S. & R. 393. Interest is payable as soon as demand is made: Crawford v. Willing, 4 Dallas 289; Donath v. Ins.

Co., Id. 463; Buchanan *v.* Montgomery, 2 Yeates 72; Albright *v.* Pickle, 4 Id. 264; Jacobs *v.* Adams, 1 Dallas 52; Graham *v.* Williams, 16 S. & R. 257. In bills for account cross-bills are not necessary: 1 Daniels Ch. 264. The Act of 1850 authorizes an account against two or more jointly. A bill may be brought by one tenant in common: McCreary *v.* Ross, 7 Watts 483; Hall *v.* Fisher, 20 Barb. 441; McPherson *v.* McPherson, 11 Iredell 391. Partition in Coleman *v.* Coleman, *supra*, was not denied because there had previously been a partition; the case having gone to trial on the general issue, all defences were admissible: Law *v.* Patterson, 1 W. & S. 184; Lockhart *v.* Power, 2 Watts 371. In Pennsylvania, under the Statute of 4 Anne, the possession of one tenant in common converts him into bailiff of the other: Griffith *v.* Willing, 3 Binney 317; Irvine *v.* Hanlin, 10 S. & R. 219; Anderson *v.* Gheble, 1 Ashmead 136; Steffen *v.* Hartzell, 5 Wharton 448; Martyn *v.* Knowllys, 8 T. R. 145; Fennings *v.* Lord Grenville, 1 Taunton 241. The measure of damages is the value after severance: Dundas *v.* Muhlenberg, 11 Casey 351; Forsyth *v.* Wells, 5 Wright 291; Lyon *v.* Gormley, 3 P. F. Smith 261.

The opinion of the court was delivered, October 19th 1869, by

SHARSWOOD, J.—That the parties to this suit are tenants in common of the Cornwall ore-banks ought to be considered as a point settled beyond all dispute. Peter Grubb was the owner in fee-simple of a large tract of land including the three hills of iron ore in question known as the Big Hill, Middle Hill and Grassy Hill. On his death intestate, it descended to his two sons Curtis and Peter, Curtis, the elder, taking two shares, according to the then law of the province. From these parties the title is regularly deduced, so that in the year 1786 two third parts were vested in Curtis Grubb and Robert Coleman, and one third part in Burd Grubb and Henry Bates Grubb. An attempt to divide the estate at that time was unsuccessful, it having been found on the report of competent persons chosen for the purpose that, owing to the impossibility of ascertaining the extent and limits of the beds and veins of ore beneath the surface of the ground, the partition proposed could not be carried into execution without the greatest injustice to some of the parties. An agreement was thereupon made, August 30th 1787, by which it was stipulated that certain persons named "should make equal partition of Cornwall Furnace, Hopewell Forge and all the lands, plantations, houses and other the real estate, late the property of Curtis Grubb and Peter Grubb, according to quantity and quality and having respect to the true value thereof, and to assign and allot the same according to the real interests and convenience of the several parties, provided always and it is hereby agreed that the ore-banks belonging to Cornwall Furnace shall remain together

and undivided as a tenancy in common, the said Curtis Grubb being entitled to three sixth parts thereof, the said Robert Coleman being entitled to one sixth part thereof, and the said minor children (Burd Grubb and Henry Bates Grubb) being entitled to the remaining two sixth parts thereof." Amicable actions of partition were entered in the Courts of Common Pleas of Lancaster and Dauphin counties, and upon the report of the persons appointed, the partition made by them was confirmed. It was adjudged in conformity to the agreement that "the ore-banks and mine-hills of Cornwall Furnace do still remain undivided, to be held by the said Curtis Grubb, Robert Coleman, Burd Grubb and Henry Bates Grubb, as tenants in common according to their respective shares."

The terms of this agreement and judgment are not susceptible of two constructions. They except the ore-banks from the operation of the partition, and declare that they shall remain as a tenancy in common. It is now, however, strenuously contended that the plaintiffs are concluded from asserting this by the judgment in Coleman v. Coleman, reported in 7 Harris 100—upon the plea of *non tenent insimul*, in an action of partition commenced in the Court of Common Pleas of Lebanon county, for these identical ore-banks, and between the same parties. The judgment of *quod partitio fiat* in the court below was reversed in this court. But this judgment is not judicially before us. It is not pleaded nor set up as a technical estoppel in any of the answers, which on the contrary expressly admit the tenancy in common, as alleged in the bill; nor indeed was the record given in evidence before the master. How, then, can it be properly adverted to, except so far as the reported decision may settle any principle applicable to this case, in which view any other judgment between other parties and relating to other lands, would be equally available? Besides which it is by no means clear that a simple judgment of reversal in a court of error is such a final judgment as to have the effect of an estoppel: Aurora City v. West, 7 Wallace, S. C. Rep. 92. The plaintiffs in that action now rely on the judgment as conclusive in this proceeding. Had they prayed for a *venire facias de novo*, and the case been remanded for another trial, the defendants could have withdrawn their plea of *non tenent insimul*, and pleaded specially the covenant of August 1787 as a bar, which would have avoided the effect of the judgment on the issue as conclusive on the question of the existence of a tenancy in common. It is true, that in Gibbs v. Bartlett, 2 W. & S. 35, Mr. Justice Rogers states that the entry of "judgment reversed" in this court without more, according to our practice, which saves expense and trouble, is a final judgment. That was said, however, in an action on a replevin-bond conditioned to prosecute the suit with effect and without delay. It would not, however, be satisfactory to rest the answer

to this argument upon such grounds as these. They are mentioned merely to show that they have not been overlooked.

The judgment for the defendants in Coleman *v.* Coleman, if, indeed, there was a final judgment, could not have been successfully set up as conclusive on the question here involved. Whenever a judgment is relied on for this purpose, it is competent for the adverse party to show that the particular point was not adjudicated, if in law it could have been rendered upon any other. If any defence was admissible under the plea of *non tenent insimul*, except that the parties were not tenants in common, it may be proved by any competent evidence that the judgment was in fact given upon such other defence. The plea of judgment recovered, itself is said to be mixed of matter of record with matter of fact: Lytle *v.* Lee, 5 Johns. 112; Thomas *v.* Rumsey, 6 Id. 33; Wilson *v.* Hamilton, 9 S. & R. 429. The principle is well stated by Mr. Justice Nelson in The Packet Company *v.* Sickles, 5 Wallace S. C. Rep. 592: " As we understand the rule in respect to the conclusiveness of the verdict and judgment in a former trial between the same parties, where the judgment is used in pleading as a technical estoppel or is relied on by way of evidence as conclusive, *per se*, it must appear, by the record of the prior suit, that the particular controversy sought to be concluded was necessarily tried and determined—that is, if the record of the former trial shows that the verdict could not have been rendered without deciding the particular matter, it will be considered to have settled that matter as to all future actions between the parties; and further, in cases in which the record itself does not show that the matter was necessarily and directly found by the jury, evidence *aliunde* consistent with the record may be received to prove the fact, but even where it appears from the extrinsic evidence that the matter was properly within the issue controverted in the former suit, if it be not shown that the verdict and judgment necessarily involved its consideration and determination, it will not be conclusive."

This principle is clearly illustrated in Hawk *v.* Breidenback, 5 S. & R. 204, which was an action upon an award for damages to the plaintiff's land between August 10th 1785 and August 4th 1786. The defendant pleaded a former recovery, and gave in evidence a verdict and judgment between the same parties in an action of trespass, the trespass having been laid in the declaration to have been committed August 10th 1785, and continued to November 3d 1788. It was held that the plaintiff might show by parol evidence that the jury in their verdict did not include the damages suffered during the period embraced in the award. " In trespass with a *continuando*," said Chief Justice Tilghman, " the plaintiff may waive the *continuando*, and prove a trespass at any time before the suit brought, or he may give evidence which goes

only to part of the time laid in the *continuando*." He added: "If the plaintiff did not in truth recover in the former action for the time between 10th August 1785 and 4th August 1786, he will suffer wrong, unless he recovers in this action. And if he might on the former trial confine himself to part of the time laid in the *continuando*, I see not why he may not now be permitted to show that he did so confine himself, because this evidence does not contradict the record." Now the case of Coleman *v.* Coleman, 7 Harris 100, must certainly be considered as settling, that under the plea of *non tenent insimul* in partition it may be shown that the parties had bound themselves by covenant not to demand partition—for such in brief was the ruling in that case—that the plea of *non tenent insimul* is the general issue, and means, in other words, that the parties do not so hold together as to be entitled to have partition. It is established by a number of cases in this court that parol evidence may be given to explain and limit the effect of a judgment wherever it is not inconsistent with the record: Zeigler *v.* Zeigler, 2 S. & R. 286; Wilson *v.* Hamilton, 9 Id. 424; Cist *v.* Zeigler, 16 Id. 282. In Carmony *v.* Haaber, 5 Barr 305, the charge of the judge to the jury, which had been filed, was referred to as sufficient to prove on what point the former decision had been made; and though in an action of covenant on the issue joined on the plea of "covenants performed" there had been a verdict and judgment for defendant, the plaintiff was allowed to show by the charge that the judgment had been rendered against him, because, suing as an administrator on the contract of a decedent for the sale of land, he had neglected to have the contract proved in the Orphans' Court, and was not therefore in a condition to tender a conveyance before action brought, and could not then compel payment of the purchase-money. It is clear upon these authorities, which might be multiplied if needed, that if there was a judgment for the defendants in the action of partition on the issue raised by the plea of *non tenent insimul*, it could be explained and limited to its true effect by reference to the opinion of this court delivered on the writ of error in that case. There it will appear that the position on the part of the plaintiffs in error, which was sustained by the court, and upon which the judgment below was reversed, was that the agreement of August 30th 1787 established a permanent tenancy in common in the ore-banks or mine-hills, and that partition of them could not be had without violating that covenant, which ran with the land, and sacrificing important interests which depended on its maintenance.

It is urged, however, that the agreement of 1787 was a partition of the land, in the only way in which it could be parted without injustice, by regulating and providing for the enjoyment of the respective shares in severalty. It has been likened to many other instances in the books where a partition is made by a severance of

12 P. F. SMITH—18

[Coleman's Appeal.]

the enjoyment of the whole.   As in the case of a mill when it is provided that one tenant shall have the entire mill for a certain term, and the other for an equal term; or one take one toll-dish, the other another, and so alternately : Co. Litt. 165 a.   So of an advowson that the tenants shall present by turns : F. N. B. 62 ; Vin. Abr. *Partition*, A 2 ; Bodicate *v*. Steers, 1 Dickens 69.   In every partition by agreement or judgment there must be a severance, so that each tenant shall thereafter enjoy his purpart in severalty.   It is impossible to extract such a severance from the agreement and judgment of 1787.   On the contrary they are as express as words can be that "the ore-banks and mine-hills of Cornwall Furnace do still remain undivided to be held by the said Curtis Grubb, Robert Coleman, Burd Grubb and Henry Bates Grubb as tenants in common according to their respective shares."   The clause which has been relied on to show a severance is as follows :—"It is hereby declared to be the true intent and meaning hereof that neither of the said parties, their agents or workmen, shall interfere or interrupt either of the other parties at any mine-hole by them opened and occupied for the purpose of raising ore."   It is impossible to put any other construction on this clause, taken in connection with the preceding one that the ore-banks shall remain together and undivided as a tenancy in common, than that the parties shall respectively be undisturbed in the enjoyment of their rights as tenants in common to take and use their respective proportions of the ore.   It cannot be pretended that it allotted to each tenant in common his mine-holes thus opened and occupied as separate and several inheritances.   It clearly implied, if it did not expressly grant, the right to open and occupy other mine-holes.   It was a covenant of perpetual peace.   Nor is there anything to warrant the inference, which has been attempted to be drawn, that while the title to the soil was to remain in common, there was assured to each party a mining right—an incorporeal easement—separate and distinct from the ownership of the land. If such right was to be unlimited in its extent, it contradicted the express stipulation that the ore-banks should be held by the tenants according to their respective interests; but if these supposed mining rights were to be enjoyed only according to those interests, they were *ipso facto* merged in the ownership.   A man cannot have an incorporeal easement to dig ore in his own fee any more than a right of way over his own close.   The incorporeal easement is necessarily extinguished by unity of title and possession.   It is unnecessary to consider the operation and effect of the supplementary agreement of the same date as that of August 30th 1787.   Whether it gave to the tenants in common incorporeal mining rights under the adjacent soil of the lands assigned and allotted in severalty, or whether it recognised those veins as forming a part of the entire body of ore connected with and

belonging to the mine-hills as a corporeal hereditament distinct and separate from the surface and remaining in common, are questions which do not arise upon this record. In either case, however, as far as this argument is concerned the result is the same. If it was an incorporeal easement it was annexed to the ownership of the mine-hills as an appurtenance thereto, and if it was corporeal it was a part of them. The conclusion then seems to be unavoidable, that by the agreement and partition of 1787 there was no severance of the title or enjoyment of the subject-matter.

Nor, as it appears to me, can it be said that these ore-banks were in any sense appurtenant to the other lands comprised in the partition of 1787. The original titles to them by warrants from the proprietaries of May 8th 1732 and December 2d 1737, were separate and distinct from those lands. A thing corporeal cannot properly be appendant to a thing corporeal: Co. Litt. 121 b. The owners of them and the adjacent tracts might perhaps have limited the use of the ore to the supply of furnaces erected or to be erected on the other lands then held by them in common. There is not a word, however, in the agreement of 1787 which intimates such an intention. Nor was it ever so treated and considered by the parties. Furnaces erected on other lands owned by them in severalty—Colebrooke, Elizabeth, Mount Hope, Mount Vernon, Manada—some of them at a distance of several miles from Cornwall, were supplied with ore from the banks without any question as to the right. Nothing is clearer or better settled than that if these banks could be appendant or appurtenant to the other lands comprised in the partition, or if that agreement can be construed to give merely an incorporeal easement of digging ore for the supply of furnaces erected or to be erected on those lands, they could not without the express agreement of all parties in interest be extended to other lands. An incorporeal easement such as a right of way cannot be used by the owner of the dominant tenement to pass to other land adjacent, or beyond that to which it is appurtenant: Kirkham v. Sharp, 1 Whart. 323; Jamison v. McCredy, 5 W. & S. 129.

Nor does it seem consonant to reason or probability that the parties to the agreement intended that the ore should be taken from the respective mine-holes without any liability to account. They were expressly to hold and enjoy according to their respective proportions. Such a stipulation would be insensible if that was their intention. That nothing was expressly introduced on the subject, and that the parties, their heirs and assigns continued for a period of sixty years to take ore from their respective mine-holes without any question or demand for account, is susceptible of a satisfactory explanation. The tenants in common during all that time were themselves iron-masters, taking the ore to be

manufactured into iron at their own furnaces.   These were char-coal furnaces, and the use of the ore was in very moderate quantities, and in all probability very nearly according to their respective proportions.   The ore in the hills seemed almost literally inexhaustible.   Forty millions of tons above water-level, capable of being worked by mere sunlight quarrying, and as much if not more below, in the then or any conceivable future condition of their business, rendered it unnecessary to provide for accounts. They did not and could not foresee the introduction of anthracite blast furnaces, nor of new means of easy transportation by steam-engines and railroads, which would make the ore a valuable object of merchandise and sale in distant markets in its raw state.   It is enough that there is nothing in the agreement to preclude an account, and in the absence of it, it has not been nor can it be pretended that the mere lapse of time creates a bar or raises a presumption of a grant in the relation in which the parties stood to each other under the agreement and partition of 1787.

Nor is it at all necessary to investigate and decide the question whether tenants in common, taking for their own use a part of the soil itself, as in this instance, could be compelled to account either at common law or under the statute 4 Anne, c. 16, § 27, Roberts' Dig. 48.   Much learning and research on this point have been exhibited by the court below and the counsel on both sides in their printed arguments.   It may be, that under the express authority given in the agreement of 1787 to the tenants in com-mon to work their respective mine-holes, they were constituted bailiffs of each other as to all ore taken beyond their respective proportions, so that if sued in an action of account at common law, they could not have sustained a plea of *ne unques* bailiff.   It may be, too, that as to ores taken from the soil itself and con-sumed or sold by the tenant, a different rule is applicable under the statute of Anne from that which both in England and this country seems well settled as to *fructus industriales*—that a tenant in common does not receive more than comes to his just share within that statute, if he merely has the sole enjoyment of the property, even though by the employment of his own industry and capital he makes a profit by the enjoyment and takes the whole of such profit: Henderson *v.* Eason, 17 Queen's B. 701; Sargent *v.* Parsons, 12 Mass. 149; Peck *v.* Carpenter, 7 Gray 283; Woolever *v.* Knapp, 18 Barb. 265; Dresser *v.* Dresser, 40 Id. 300; Nelson *v.* Clay, 7 J. J. Marsh 140; Pico *v.* Columbet, 12 Cal. 419; Izard *v.* Bodine, 3 Stockton 404; Raygan *v.* McCoy, 29 Mis. 356; and see especially as to stone taken from a limestone quarry, Roberts *v.* Roberts, 2 Jones Eq. 133.   That there was any liability for waste has not been and could not be pretended; for it is not waste even in a tenant for life or years to work mines or quarries already opened, and here there was implied if not

express authority given to make new openings, for the common property could not be fairly enjoyed without such authority. All these questions, curious and interesting as they are, and ably discussed as they have been, are closed, as it appears to us, by the provisions of the Act of Assembly passed April 25th 1850, § 24, Pamph. L. 573, at least so far as this proceeding is concerned. It enacts "that in all cases in which any coal or iron ore, mines or minerals have been or shall be held by two or more persons as tenants in common, and coal, iron ore or other mineral has been or shall be taken from the same by any one or more of said tenants respectively, it shall be lawful for any one f said tenants in common to apply by bill or petition in equity to the Court of Common Pleas of the county in which the lands lie, praying that an account may be decreed and taken of all coal, iron ore or other mineral taken by said tenants respectively; and the said court shall thereupon proceed upon such bill or petition agreeably to the course of a court of chancery, and shall have full power and authority to make all orders, appointments and decrees, interlocutory and final, that may appertain to justice and equity in the premises; and may cause to be ascertained the quantity and value of the coal, iron ore or other mineral so taken respectively by the respective parties, and the sum that may be justly and equitably due by, from and to them respectively therefor, according to the respective proportions and interests to which they may be respectively entitled in the lands." It must be conceded, I think, that this act is drawn with great ability and precision. It cannot be doubted that its purpose was to give a remedy more liberal and extensive than those afforded either by the common law or the statute of Anne. The word *take* is carefully used instead of *receive*, upon which the restricted construction of that statute is based. Even the question discussed in the opinion below as to what constitutes a mine in this country is put to rest; for it employs the terms, "mines or minerals held in common," so that ore lying exposed on the surface of the ground is clearly included. It provides that the account shall be taken between all the tenants in one proceeding, and the sum that may be justly and equitably due "by, from and to them respectively" ascertained, so that if as between any of the parties defendants there is a defence in law or equity which can be set up against an account, it can be made available—whether on the answers before the decree to account, or afterwards before the master, it is not now necessary to decide. That the act applies to and governs this case is clearly stated in more than one place in the opinion of this court in Coleman v. Coleman, 7 Harris 110, 112.

It is urged, however, that before any liability to account can arise it must appear that the co-tenant upon whom the demand for an account is made has actually taken more than his just share or

proportion of the entire mass of ore in the beds or banks. It might be enough to say that the Act of Assembly makes no such provision. It applies to any case where coal, iron ore, or other mineral, has been or shall be taken from the common property. It does not say or imply more than a just share or proportion. The remedy would be illusory if such a construction should prevail. No one can tell what the just share or proportion of each .tenant will be until the whole mine or bank is exhausted of its entire deposit. In such a mass, practically inexhaustible for generations to come, it would make the one ninety-sixth part equal to the other ninety-five, and really destroy to that extent their proportionate value. As was well said in Barnum v. Landain, 25 Conn. 150, the case of an iron mine divided into twenty-four shares : " The error of the defendants lies in this : they contend that they own absolutely whatever they get out of the ore-bed, if it is not too much, whereas they own only one twenty-fourth part of what they get out, and must account at reasonable times for the other twenty-three parts to the plaintiff."

Concluding then, as we do, that the parties to this proceeding are tenants in common of the ore-banks in question in the proportions set out in the bill and admitted in the answers, and that they are liable to account, under the Act of Assembly of April 25th 1850, for all iron ore taken by them respectively, it remains to inquire upon what basis the value of such ore is to be ascertained so as to arrive at "the sum that may be justly and equitably due by, from and to them respectively therefor, according to the respective proportions and interests to which they may be respectively entitled in the land."

It seems that even where a trespass has been committed, if innocently and unintentionally, by working over a party's own line into his neighbor's adjacent tract, the measure of damages is— besides any actual injury to the land—the value of the mineral or timber taken *in place,* or at the farthest when first severed. There is some conflict in the authorities, which need not now be adverted to : Morgan v. Powell, 3 Queen's Bench, 278 ; Martin v. Porter, 5 M. & W. 351 ; Wild v. Holt, 9 Id. 672 ; Wood v. Marewood, 3 Queen's Bench 440, n. ; Bennett v. Thompson, 13 Iredell (Law) 146 ; Forsyth v. Wells, 5 Wright 291 ; Lyon v. Gormley, 3 P. F. Smith 261. In Herdic v. Young, 5 P. F. Smith 176—which was an action of replevin—it was held that where the defendant, mistaking his line, had cut logs on an adjoining tract, and then drove them down to the boom in the river below, the measure of damages is the value of the logs in the boom, less the cost of cutting and hauling them to the river and driving them there. But the case of the defendants is entitled to still more favorable regard than that of a trespasser, though by mistake or ignorance. There the plaintiff's property has been taken wrongfully and against his

[Coleman's Appeal.]

will.   Here a tenant in common exercises his undoubted right to take the common property, and he has no other means of obtaining his own just share than by taking at the same time the shares of his companions.   The value of the ore in place is, therefore, the only just basis of account.   This is the same as the value of what is called ore-leave—that is, what the right to dig and take the ore is worth.   Indeed all parties, as well as the master and court below, seem eventually to have settled upon this basis.   But how is the value of ore-leave to be ascertained ?   It is evident, in the nature of things, that it can have no general market price.   It will depend necessarily upon the position and circumstances of each particular mine, as well as on the character of the ore.   The value of it at the pit's mouth depends upon its quality and its proximity to the furnace where it is to be used, and on the means of transportation.   In addition to this the price of the ore-leave will be influenced by the expense and risk of the process of mining, or of taking it from its place to the pit's mouth.   It is evident that the price given for ore-leave in other mines or beds can afford no safe criterion, unless they should be precisely similar in all these respects to the one in question.   As to the Cornwall ore-banks no sales had ever been made of ore-leave.   No evidence was laid before the master as to what, in the opinion of experts, ore-leave in these banks would have commanded in the market.   The master arrived at it by ascertaining the market value of the ore at the pit's mouth, and then deducting from that the cost of mining.   We cannot see that under all the circumstances any more just and equitable mode could have been adopted.   We do not mean to say that it would hold in any other case than the one now before the court—certainly not where the mining is expensive and hazardous.   Where the tenant in common of a coal-mine, for example, must with great outlay of capital construct expensive machinery, and incur all the risks of such an undertaking, the value of ore-leave or coal in place could not be ascertained by so simple a calculation.   The usual profits on capital embarked in such a hazardous enterprise with the proper allowance for personal skill and superintendence would seem to be no more than fair and reasonable deductions. Certainly any business man, sitting down to calculate what he ought to give for ore-leave, would take all these elements into consideration.   Otherwise, with his own capital and at his own risk, he would separate the ore from its natural position, and place it on the surface enhanced in value, for the benefit of a stranger. We leave the rule in such a case to be determined when it arises. But the case of the Cornwall ore-banks is very different and very peculiar.   Very little outlay of capital was required,—the wages of day laborers and the pick-axe and shovel, with occasional charges of powder for blasting, made up all that was to be pro-

vided.   The returns were immediate: the ore was removed to be used or sold as soon as loosened.   No personal skill or superintendence by the tenants in common was shown, and whatever was necessary was hired and allowed in the cost of mining.   Besides upon the determination of the master and court below on the subject of interest, and which for this and other reasons we think was right, the proceeds or value of the ore in the hands of the defendants, who took more than their proportion, remained in their possession to be employed by them as capital without charge.   No interest account is made out, except from the time of closing the account, January 1st 1859.   No possible hazard of loss was incurred, except that of bad debts, but with that the tenants calling for the account had nothing to do.   The value at the pit's mouth is the cash value, that for which it might have been sold for cash, and indeed it would hardly seem questionable that one tenant in common, after mining any determinate quantity, might separate his own share, and give notice to the other tenants to remove theirs. The tenants at their respective mine-holes under the agreement of 1787, may have been bailiffs of their companions to dig and take, but certainly they were not their bailiffs to manufacture or sell. If they were, the account must be settled on entirely different principles.   The peculiarity in the ore-banks now in question cannot perhaps be better stated than in the language of the defendants, Robert Coleman and George Dawson Coleman, in their further answer, which dispenses with the necessity of a reference to the testimony of the witnesses which fully confirms it.   " The uniform mode of working these hills for a century past has been by superficial diggings in the manner usual in levelling hills or digging gravel from hills or mounds thereof above the surface of the land, when the intent was to remove the whole of the hill, and level the site thereof.   There has never been any subterranean working for iron ore, nor any of the expensive contrivances usual in mining; the work has always been prosecuted by daylight, and there have been no cuttings or excavations of greater depth than thirty feet, except the cuttings in the breast of the hills from the base or near the base, and which have been thus worked into, and upon the face of the hill to a greater depth, but never lower than the level of the road, by which the ore when dug is carried away. The motive for making these deeper cuttings, rather than continuing the surface diggings, has been the greater convenience of loading in railway cars, which are brought to the side of the hill. In no case has there been any work done in getting iron ore in the manner of ordinary mining, but always by such superficial and surface diggings as have been described.   And the workings are in another particular varied from that usual in mining, viz. : that the whole body of the hill, which is dug into, as well that which lies below the surface as the surface itself, is carried away and

[Coleman's Appeal.]

used as iron ore for smelting.  \*.  \*   \*   Nor is there nor can there be for years to come any distinction between the respective owners, either in the facility of working or in the quality of the ore."

Upon the whole then we are of the opinion that, looking at the peculiar character of these ore-banks and the evidence submitted by the parties, the master and the court below adopted the true mode of ascertaining the value of the ore, and arriving at the sums justly and equitably due by the respective parties, who had taken it in excess of their shares.

In regard to the conclusions of the master upon the evidence as to the market value of the ore at the pit's mouth, the deductions proper to be made, and the other questions of fact passed upon by him, we see no reason for the court below to interfere.  The office of a master in chancery is like that of a jury in the courts of common law.  If there has been a clear mistake or a palpable abuse of power either of them ought to be corrected.  But if anything should be done or inquiry instituted beyond that as to matters of fact, the office of master would prove but little aid in the administration of justice—the court being compelled to go over all the evidence again, and thus their labors be greatly and unnecessarily increased : Mason *v.* Crosby, 3 Woodb. & Minot 258.  The numerous and varied exceptions to the master's report and to the proposed decree were as we think properly disposed of by the learned court below.

> Decree affirmed ; appeals dismissed—the costs of these appeals to be paid by the parties in the proportion of their respective interests.